## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ANTHONY FLISS,

    Plaintiff,

    vs.                                Civ. No. 19-1042 KK

ANDREW SAUL, Commissioner
of the Social Security Administration,

    Defendant.

### MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Plaintiff Anthony Fliss's ("Mr. Fliss") Motion to Reverse and Remand for Rehearing with Supporting Memorandum (Doc. 16) ("Motion"), filed March 10, 2020, seeking review of the unfavorable decision of Defendant Andrew Saul, Commissioner of the Social Security Administration ("Commissioner"), on Mr. Fliss's claims for Title II disability insurance benefits ("DIB") and Title XVI supplemental security income ("SSI") under 42 U.S.C. §§ 405(g) and 1383(c)(3). The Commissioner filed a response in opposition to the Motion on June 3, 2020 (Doc. 10), and Mr. Fliss filed a reply in support of the Motion on June 24, 2020.  (Doc. 20.)  Having meticulously reviewed the entire record and the applicable law and being otherwise fully advised in the premises, the Court FINDS that Mr. Fliss's Motion is well taken and should be GRANTED.

## I.    Background

### A.    Procedural History

On June 6, 2016, Mr. Fliss filed an application with the Social Security Administration ("SSA") for DIB and SSI. (Administrative Record ("AR") 239, 240.) He alleged a disability onset date of December 20, 2013 (AR 241, 256) due to depression, osteonecrosis, acid reflux, a learning

disability, and high blood pressure. (AR 241-42, 256-57.) Disability Determination Services ("DDS") determined that Mr. Fliss was not disabled both initially (AR 254) and on reconsideration (AR 292). Mr. Fliss requested a hearing with an Administrative Law Judge ("ALJ") on the merits of his application. (AR 335.) Prior to his administrative hearing, Mr. Fliss amended his disability onset date to June 6, 2015. (AR 421.)

ALJ Stephen Gontis held a hearing on October 12, 2018. (AR 183-238.) Mr. Fliss and Vocational Expert Leslie White testified. (AR 183.) The ALJ issued an unfavorable decision on November 26, 2018. (AR 012-29.) The Appeals Council denied Mr. Fliss's request for review on September 12, 2019 (AR 001-4), making the ALJ's decision the final decision of the Commissioner from which Mr. Fliss appeals. *See Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003).

**B.      Mr. Fliss's Background and Mental Health History**[1]

Mr. Fliss is a thirty-six-year-old high school graduate who completed one year of college. (*See* AR 748-79.) In grade school, he was in special education classes and was placed in a "restrictive environment" that included being at home for part of the day, being in school for only four hours, riding a special bus, and having escorts when at school because "he was considered to be a danger to others." (AR 198, 505.) After high school, he enrolled in college and was studying to become a pharmacy technician, but it was "pretty hard" for him and he was not allowed to take the test due to excessive absences. (AR 201, 505.) His past work includes tree care worker, caregiver, baker and truck unloader at Walmart, and concrete construction laborer. (AR 195-96.) He was fired from Walmart because of too many unreported absences. (AR 505.) He was laid off

---

[1] Although Mr. Fliss alleged disability due to physical as well as mental impairments, he challenges no aspect of the ALJ's decision regarding his physical impairments; therefore, the Court focuses its discussion on the evidence related to Mr. Fliss's mental impairments.

from his last job in construction in December 2013 due to the economy and has not worked since then. (AR 194-95, 423.)

At his administrative hearing, Mr. Fliss testified that the main reason he cannot work is the pain he experiences from various physical impairments. (AR 200, 201.) He reported having had four surgeries on his right ankle in recent years, hip replacement surgery in 2017, and various back and neck pain due to "all the accidents" he had been in.[2] (AR 201, 206-7.) As of his hearing, he wore a boot to relieve pressure on his ankle, used a cane to walk, and anticipated needing additional surgery to fuse his ankle. (AR 202.) Mr. Fliss also reported having difficulty being around other people. (AR 205.) He described himself as "not too much of a people person" and indicated feeling "nervous" around the number of people in the hearing room. (AR 205.) He explained that he had been diagnosed with post-traumatic stress disorder ("PTSD") and major depressive disorder, was being treated with an antidepressant, and saw a counselor once a month. (AR 207-8.)

Medical treatment records indicate that when Mr. Fliss was nine years old, he witnessed his two best friends drown in a ditch. (AR 655.) In adulthood, he reported having "hallucinations" of and nightmares about people drowning. (AR 534, 655.) He reported experiencing sexual abuse as a child, (AR 534, 748, 759), and that his father, a heroin addict, was incarcerated during his formative years.  (AR 844.)  At age fifteen, he married a woman from Mexico, with whom he had a son. (AR 534.) In 2015, he indicated that he had not seen his son in "many years" due to past-due child support and because of a restraining order from a domestic violence incident.[3] (AR 505, 534.) Mr. Fliss reported being incarcerated "numerous times for things like drugs and domestic

---

[2] The record indicates that Mr. Fliss was in a motor vehicle accident in October 2015 (AR 661-63, 770) and was hit by a car while riding a bike in March 2016. (AR 535, 632.)

[3] Mr. Fliss reported that the restraining order was in place because he had gotten into a fight with his ex-wife's boyfriend and "beat him up." (AR 505.)

violence." (AR 505.) He first used drugs when he was eight years old and his brothers introduced him to marijuana. (AR 505.) Other substances he has abused include mushrooms, ecstasy, acid, heroin, and methamphetamine, and he has a history of alcohol abuse. (AR 505.) He lost a brother in 2003, and his father in 2008. (AR 534, 844.)

In February 2014, Mr. Fliss's primary care doctor, Will Kaufman, M.D., diagnosed him with major depressive disorder and generalized anxiety disorder and referred him for a mental health evaluation and medication initiation. (AR 605-7.) In April 2014, Dr. Kaufman began treating Mr. Fliss with an antidepressant (AR 598-600), and in May 2014, he added prescriptions for trazadone and prazosin to treat Mr. Fliss's insomnia and nightmares. (AR 594-96.) In August 2014, Dr. Kaufman increased Mr. Fliss's antidepressant dosage, which Mr. Fliss reported seemed to help. (AR 586-90.)

In 2015 and into early 2016, Mr. Fliss reported having thoughts of self-harm and suicidal ideation on numerous occasions. (AR 560-63, 564-65, 568, 590, 644-46, 664-65.) He reported that in June 2015 his girlfriend took his gun away from him, in July 2015 his mother hid his gun from him, and in March 2016 his mother again took his gun away. (AR 560-63, 564-65, 644-46.) In July 2015, he presented at the University of New Mexico Psychiatric Center and had to be restrained by police because of his "violent and agitated" behavior. (AR 512-14.) Treatment records indicate that he smelled of alcohol, appeared intoxicated, and was suspected of using a stimulant. (*Id.*) He was treated with antipsychotic and anti-anxiety medications, kept overnight, and discharged the next day. (*Id.*)

After Dr. Kaufman referred him to counseling numerous times, Mr. Fliss established care with Elizabeth Etigson, LPCC, at Outcomes, Inc. in December 2015. (*See* AR 527-32, 554, 558, 564-65.) LPCC Etigson initially diagnosed Mr. Fliss with depression (not otherwise specified)

4

(AR 532), and in January 2016 she added a diagnosis of PTSD. (AR 533.) Between December 2015 and June 2016, she counseled him on nine occasions regarding his nightmares about his friends drowning, his father's death, his estrangement from his son, his desire to return to school and work, and his physical pain. (AR 534-36.) LPCC Etigson's treatment plan for Mr. Fliss included journaling and attending AA meetings. (*Id.*)

In July 2016, Mr. Fliss reported to Dr. Kaufman that he was feeling "very depressed" and was having suicidal ideation. (AR 562.) In August 2016, he told Dr. Kaufman that he was "having frequent panic attacks" that occurred every other day and experienced "[c]onstant anxiety as well." (AR 543.) Dr. Kaufman diagnosed Mr. Fliss with "[s]evere anxiety with panic" and continued treating him with an antidepressant, trazodone, and prazosin. (AR 543-44.)

In March 2017, Mr. Fliss reestablished treatment with LPCC Etigson. (AR 754-55.) She continued to provide supportive therapy and counseling to address Mr. Fliss's anger and depression, alcohol abuse, chronic pain, and desire to go back to school and return to work. (AR 754-61.) She counseled him to continue journaling to address his anger and depression, go to AA meetings, look into the Manage Your Chronic Disease program to address his problems with chronic pain, and seek assistance from the Division of Vocational Rehabilitation to address his interest in returning to the workforce. (AR 754.) In her June 2017 treatment note, LPCC Etigson noted that Mr. Fliss had recently been arrested and jailed for punching a person in the mouth after the person called him names. (AR 993.) She explained that Mr. Fliss "has not been able to find other ways to defend himself beside[s] punching, even tho[ugh] his aggressive behavior has cost him visits with his son for many years." (*Id.*) Mr. Fliss reported that he ended up with a bad infection in his hand as a result of the altercation and even thought at one point that he may lose his hand. (*Id.*) The incident appeared to leave him "motivated" to find a job, and he indicated that

5

he took his hand healing "as a sign that he is supposed to live and thrive." (*Id.*) LPCC Etigson encouraged him to practice stopping and thinking, stay focused on seeing his son again, and add positive thoughts to his morning and nighttime prayers. (*Id.*)

In September 2017, Mr. Fliss was taken by police to the Behavioral Health unit at Presbyterian Hospital because he was having hallucinations. (AR 077.) He reported that he had not taken his medications in three days and admitted to using amphetamine and alcohol. (AR 077.) He was observed to be anxious and was kept overnight but was discharged to his own care with instructions to follow up with Outcomes, Inc. (AR 071, 073, 077.)

In March 2018, Mr. Fliss underwent a behavioral health assessment as part of the screening process to receive treatment for his opioid dependence. (AR 844-48.) He reported that he had "been broken over the past five years[,]" having undergone 10-13 surgeries during that time. (AR 844.) When he established with a new behaviorist in April 2018, he described goals of staying sober, going back to school, and getting a job. (AR 817.) He discussed his anxiety, depression, and PTSD and stated that he does not do well in crowds and spends a lot of time at home with his dogs. (*Id.*) In May 2018, he was restarted on his antidepressant based on his report of a recent increase in symptoms of insomnia and intermittent low mood. (AR 810-11.) In June 2018, he reported that he was "still experiencing panic attacks and will have to leave the situation and go outside to calm down." (AR 808.)

## C.    Medical Opinions

### 1.    Consultative Examiner Mary Loescher, Ph.D.

In November 2015, Mr. Fliss underwent a consultative psychological examination with Mary Loescher, Ph.D., upon referral by DDS. (AR 504.) In addition to conducting a clinical interview and mental status examination, Dr. Loescher reviewed medical records and the disability

report provided by DDS and administered the Wechsler Adult Intelligence Scale IV test. (*Id.*) She

rendered diagnoses of (1) borderline intellectual functioning, (2) alcohol use disorder, (3) history

of polysubstance abuse, and (4) antisocial personality disorder, and offered the following summary

and impressions:

> Mr. Fliss reports chronic pain secondary to problem with his ankle and back. He
> reports a long history of drug and alcohol use and is currently using alcohol. This
> may be of concern if he is being prescribed narcotic pain medication. Cognitive
> functioning is in a borderline range of ability. From a cognitive standpoint he would
> be mildly impaired in his ability to understand and follow through on basic work
> instructions. He would be severely impaired in his ability to follow through on more
> complex work instructions. By his reported history it is possible that he could be a
> danger to others in a work setting. He is capable of managing his own finances if
> given benefits.

(AR 507.)

### 2.    Consultative Examiner John Draper, Ph.D.

On February 6, 2017, Mr. Fliss underwent a consultative evaluation with John Draper,

Ph.D. (AR 748.) After reviewing records, interviewing Mr. Fliss, and performing a mental status

examination, Dr. Draper diagnosed Mr. Fliss with PTSD, major depressive disorder (single

episode, moderate), and borderline intellectual functioning (by history). (AR 751.) He offered a

prognosis of "[p]oor to fair, given the severity of his medical symptoms, problems with attention,

concentration, anxiety, and panic attacks, and his trauma symptoms." (AR 748-51.) Regarding Mr.

Fliss's work-related functional limitations, Dr. Draper opined:

> The claimant's ability to reason is good and his social judgment is somewhat
> impaired. His understanding is fair to good. His long[-]term memory is poor and
> his recent memory is fair. Sustained concentration and persistence are impaired.
> The claimant was unable to complete serial sevens or serial threes and is unable to
> read a book. The claimant's social interaction is poor to fair. He does not socialize
> with family or friends and attends no social events. As far as adaptation, the
> claimant continues to do cooking, cleaning, and laundry around the house despite
> his . . . immobility problems. The claimant's ability to understand, remember, and
> carry[] out instructions is slightly impaired. The claimant is not able to interact
> appropriately with supervisors, co-workers, or the public due to social anxiety,

panic attacks, and trauma symptoms. Alcohol and substances do not appear to contribute to the claimant's limitations. The claimant is able to manage benefits in his own best interests.

(AR 751.)

### 3. State Agency Consultants

Non-examining State agency consultant Cathy Simutis, Ph.D., reviewed Mr. Fliss's claims at the initial level on February 15, 2017. (AR 253.) The initial-level Disability Determination Explanation ("DDE") indicated that the medical source opinions of Dr. Loescher and Dr. Draper were "afforded great weight" because they were "generally consistent with exam and with bulk of evidence in file[.]" (AR 249.) In the Mental Residual Functional Capacity Assessment ("MRFCA") she completed, Dr. Simutis found that Mr. Fliss had the following limitations: *marked* limitations in the ability to (1) carry out detailed instructions, and (2) interact appropriately with the general public; and *moderate* limitations in the ability to (1) understand and remember detailed instructions, (2) maintain attention and concentration for extended periods, (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (4) work in coordination with or in proximity to others without being distracted by them, (5) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, (6) accept instructions and respond appropriately to criticism from supervisors, (7) get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and (8) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (AR 251-52.) In her MRFC explanation, Dr. Simutis stated, "The claimant is able to perform work where interpersonal contact is incidental to work performed, complexity of tasks is learned and performed by rote, few variables, little judgment, supervision required is simple, direct and concrete

(unskilled)." (AR 253.) Indicating that there were no other opinions of record that assessed greater restrictions than those she found, Dr. Simutis included no reconciliation of source opinions. (*Id.*)

On June 8, 2017, non-examining State agency consultant Stephen Drake, Ph.D., reviewed Mr. Fliss's claims and Dr. Simutis's findings at the reconsideration level. (AR 282.) Dr. Drake's MRFCA findings differed from Dr. Simutis's in many respects. In the two areas of functioning where Dr. Simutis assessed *marked* limitations, Dr. Drake found only *moderate* limitations. (*Compare* AR 251-52, *with* AR 289-90.) And Dr. Drake agreed with only three of Dr. Simutis's eight assessments of *moderate* functional limitations: (1) understand and remember detailed instructions, (2) maintain attention and concentration for extended periods, and (3) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (*Id.*) In all other areas where Dr. Simutis found *moderate* limitations, Dr. Drake found that Mr. Fliss was not significantly limited. (*Id.*) Dr. Drake additionally found that Mr. Fliss had a *moderate* limitation in the ability to respond appropriately to changes in the work setting where Dr. Simutis found no limitation. (*Compare* AR 252, *with* AR 290.) In his narrative explanation, Dr. Drake found that Mr. Fliss "retains the ability, on a sustained basis, to understand and remember simple instructions[,] . . . carry out simple instructions, make simple decisions, and maintain concentration and attention for extended periods." (AR 290.) He further found that Mr. Fliss "retains the ability to respond appropriately to changes in a routine work setting." (*Id.*) Explaining that he found the "marked limits in social f[unctioning]" assessed at the initial level to be "inconsistent with [the evidence of record] which indicates a lesser level of impairment[,]" Dr. Drake found that Mr. Fliss "retains the ability to respond appropriately to supervisors, coworkers and work situations with limited public contact." (*Id.*) Dr. Drake's explanation does not identify what evidence of record indicated a lesser level of impairment in social functioning. Regarding the other opinions of record,

the reconsideration-level DDE indicates that the "[o]verall evidence does not fully support" either Dr. Loescher's or Dr. Draper's opinion. (AR 283.) However, like Dr. Simutis, Dr. Drake indicated that there were no opinions of record more restrictive than his and therefore included no reconciliation of source opinions. (AR 291.)

**D.      The ALJ's Decision**

In his decision, the ALJ found that Mr. Fliss's "severe impairments" include, *inter alia*, depression, anxiety, PTSD, and schizophrenia spectrum and other psychotic disorders. (AR 017-18.) Finding that the record did not support finding any of Mr. Fliss's "severe impairments" presumptively disabling (AR 018-20), he proceeded to assess Mr. Fliss's RFC to determine whether he could either return to his past relevant work or make an adjustment to other work. (AR 020-27.) The ALJ assessed Mr. Fliss as having, in relevant part, the following RFC:

> He is able to perform simple, routine tasks and make simple work-related decisions. The claimant is able to interact with supervisors and coworkers on an occasional basis but must have infrequent and superficial contact with the public. He is able to tolerate few changes in a routine work setting and time off-task would be accommodated by normal breaks.

(AR 020.) He assessed no limitations in Mr. Fliss's ability to maintain attention for extended periods of time, maintain regular attendance and being punctual within customary tolerances, and/or complete a normal workday and workweek without interruptions from psychologically based symptoms. In discussing the evidence supporting the RFC he assessed, the ALJ considered, *inter alia*, the medical opinions of record, according "significant weight" to the opinions of State agency consultants Dr. Simutis and Dr. Drake, "some weight" to Dr. Loescher's opinion, and "[l]imited weight" to Dr. Draper's opinion. (AR 026.)

After assessing Mr. Fliss's RFC, the ALJ proceeded to find that while Mr. Fliss is unable to perform his past relevant work, he is capable of making a successful adjustment to other work

that exists in significant numbers in the national economy, specifically addresser, document preparer, or stuffer. (AR 027-28.) He therefore found that Mr. Fliss was not disabled. (AR 028.)

## II. <u>Applicable Law</u>

### A.   Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (alteration and quotation marks omitted). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues de novo. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118 (internal quotation marks omitted), or "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must

include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

**B.      Consideration and Evaluation of Evidence**

The ALJ must consider "all relevant evidence in the case record" in making a disability determination. SSR 06-03p, 2006 WL 2329939, at *4 (Aug. 9, 2006).[4] Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence[.]" *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). The ALJ must discuss not only the evidence supporting his decision but also "the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Id.* at 1010. The ALJ's decision must demonstrate application of the correct legal standards applicable to different types of evidence, and failure to follow the "specific rules of law that must be followed in weighing particular types of evidence in disability cases . . . constitutes reversible error." *Reyes v. Bowen*, 845 F.2d 242, 244 (10th Cir. 1988).

### III.  Discussion

Mr. Fliss essentially makes two arguments on appeal: (1) the ALJ erred in his handling of the medical opinions of record; and (2) the ALJ erred as a matter of law by failing to make certain required findings at step five of the sequential evaluation process. (Doc. 16 at 1-2.) The Commissioner argues that the ALJ reasonably weighed the medical opinions of record and reasonably relied on VE King's testimony in finding Mr. Fliss not disabled at step five. (Doc. 19 at 7, 15.) For the following reasons, the Court agrees with Mr. Fliss that the ALJ committed numerous errors in handling the medical opinions and that the RFC he assessed—which fails to

---

[4] The Court acknowledges that certain Social Security Rulings, including SSR 06-03p, that the Court relies on in its analysis have been rescinded effective for claims filed on or after March 27, 2017. *See* SSR 96-2P, 2017 WL 3928298, at *1 (Mar. 27, 2017). However, as noted above, Mr. Fliss filed his claims in 2016, meaning the rescinded rulings and case law interpreting them are still applicable.

either include all of the limitations indicated in the medical opinions or adequately explain why they were being rejected—is consequently not supported by substantial evidence, necessitating reversal and remand.

### A.    Applicable Law: Consideration and Weighing of Medical Opinions

Medical opinions must be weighed using the factors set forth in 20 C.F.R. §§ 404.1527(c), 416.927(c), comprising (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors.[5] To be sure, "[n]ot every factor for weighing opinion evidence will apply in every case," SSR 06-03p, 2006 WL 2329939, at *5, and the ALJ is not required to "apply expressly each of the six relevant factors in deciding what weight to give a medical opinion." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Rather, what is required is that the ALJ provide good reasons for the weight he gives an opinion and that his explanation is sufficiently specific to make it clear to any subsequent reviewers the weight given to an opinion and the reasons for that weight. *See id*.

The Social Security regulations "provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996). In considering the medical opinions of record, the ALJ should generally accord more weight to the opinion of a source who has examined the claimant than to the opinion of a source who has rendered an opinion based on a review of medical records alone. *See* 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1); *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) ("[A]n examining medical-source opinion is . . . given particular consideration: it is presumptively entitled to more weight than a doctor's opinion derived from a

---

[5] The SSA has issued new regulations regarding the evaluation of medical source opinions for claims filed on or after March 27, 2017. *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); 20 C.F.R. 416.927 and 416.920c. Because Mr. Fliss filed his claims in 2016, the previous regulations still apply to this matter. *Id.*

review of the medical record."); *cf. Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) ("The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all."). Indeed, "the opinions of State agency . . . psychological consultants . . . can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence . . ., the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency . . . psychological consultant[.]" SSR 96-6p, 1996 WL 374180, at *2.

"If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996). The ALJ must provide "appropriate explanations for accepting or rejecting" a medical source's opinion. SSR 96-5p, 1996 WL 374183, at *5 (Jul. 2, 1996). An ALJ commits reversible error when he fails to set forth adequate reasons explaining why a medical opinion was rejected or assigned a particular weight and to demonstrate that he has applied the correct legal standards in weighing the medical opinions and evaluating the evidence. *See Reyes*, 845 F.2d at 244.

**B.      The ALJ Erred in His Handling of the Medical Opinions**

Mr. Fliss challenges two aspects of the ALJ's handling of the medical opinions of record. He argues that the ALJ erred by failing to properly weigh the opinions of consultative examiners Dr. Loescher and Dr. Draper. (Doc. 16 at 20-26.) Separately, he contends that the ALJ failed to account for or explain why he was not incorporating all the *moderate* limitations assessed by Dr. Simutis in the RFC he assessed. (Doc. 16 at 16-20.) The Court addresses the claimed errors in turn.

**1.      The ALJ's Handling of the Consultative Examiners' Opinions**

**a.      Dr. Loescher**

The ALJ explained that he was according only "some weight" to Dr. Loescher's opinion because "it does not account for the limitations shown in the record regarding the claimant's ability to interact with others." (AR 026.) (Doc. 16 at 21-23.) Mr. Fliss argues that the ALJ's explanation lacks both clarity and support in the record. (Doc. 16 at 21.) The Court agrees and additionally finds that the ALJ's decision fails to demonstrate application of the correct legal standard for weighing medical opinions.

As Mr. Fliss points out, Dr. Loescher indicated in her report that "[b]y [Mr. Fliss's] reported history[,] it is possible that he could be a danger to others in a work setting." (AR 507.) This statement directly reflects upon Mr. Fliss's ability to interact with others. The ALJ's decision fails to acknowledge, much less account for, this aspect of Dr. Loescher's opinion. To the extent the ALJ disregarded Dr. Loescher's finding because she did not translate it into a functional limitation—e.g., that Mr. Fliss had a *moderate* or *marked* limitation in his ability to accept supervision and/or get along with coworkers—he erred in doing so. There is no requirement that a medical source provide a function-by-function assessment of a claimant's mental limitations. It is the ALJ who is responsible for assessing a claimant's limitations on a function-by function basis, taking into consideration the evidence of record, including findings such as Dr. Loescher's. *See* SSR 96-8p, 1996 WL 374184, at *3 (explaining that the RFC assessment—which is an issue reserved to the Commissioner, i.e., is the province of the ALJ and not a medical source—"must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis"); Social Security Program Operations Manual Systems ("POMS") § DI 24510.005.A (explaining that the RFC assessment process, *inter alia*, "*evaluates* and *interprets* medical and other evidence" (emphasis added)); *Green v. Comm'r of Soc. Sec. Admin.*, 734 F. App'x 600, 603 (10th Cir. 2018) (unpublished)[1] (noting that "a function-

by-function assessment of a claimant's capacities" is something the ALJ, not a medical source, was required to provide). Moreover, whether Dr. Loescher had translated her opinion into a functional assessment is *not* one of the enumerated regulatory factors the ALJ was to consider in weighing Dr. Loescher's opinion. *See* 20 C.F.R. §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). To the extent it could qualify as an "other factor," *see* 20 C.F.R. §§ 404.1527(c)(6), 416.927(c)(6) (providing that "we will also consider any factors . . . of which we are aware, which tend to support or contradict the medical opinion"), the ALJ failed to offer any explanation to support discounting Dr. Loescher's opinion on that basis.

Furthermore, the ALJ's decision evinces no consideration of the supportability and consistency of Dr. Loescher's finding regarding Mr. Fliss's ability to interact with others vis-à-vis the other evidence—including medical opinions—of record. The "reported history" that Dr. Loescher's finding rested on included: (1) when Mr. Fliss was in grade school, he was not allowed to be in the hallways unaccompanied and had to be escorted to and from the separate school bus he rode "because he was considered to be a danger to others"; (2) Mr. Fliss had not seen his son in three years due to a restraining order put in place after "he got into an altercation with [his ex-wife's] boyfriend and beat him up"; and (3) Mr. Fliss had been incarcerated "numerous times" for, *inter alia*, domestic violence. (AR 505.) Additionally, Mr. Fliss was described as exhibiting "aggressive" behavior, requiring police intervention when he presented at the UNM Psychiatric Center in July 2015. (AR 515.) And LPCC Etigson observed in June 2017—after Mr. Fliss reported being arrested and jailed for committing a battery—that Mr. Fliss still "has not been able to find other ways to defend himself beside punching" despite his violent outbursts costing him time with his son. (AR 993.) Finally, Dr. Draper found that Mr. Fliss "is not able to interact appropriately with supervisors, co-workers, or the public" (AR 751), and Dr. Simutis found Mr.

16

Fliss to have *moderate-to-marked* limitations in all areas of social functioning she assessed. (AR 252.) The ALJ's consideration of Dr. Loescher's opinions fails to evince consideration of any of the foregoing evidence, all of which tends to support and is consistent with Dr. Loecsher's finding regarding Mr. Fliss's potential dangerousness to coworkers, a finding for which the ALJ failed to account.

Instead of evaluating and interpreting Dr. Loescher's finding in accordance with the regulatory factors for weighing medical opinions as he was required to do, the ALJ ignored—or perhaps overlooked—it. Either way, his failure to evince consideration of this critical finding and either account for it in his RFC or adequately explain why he was rejecting it constitutes reversible error.

### b.    Dr. Draper

 The ALJ accorded "limited weight" to Dr. Draper's "opinion" that Mr. Fliss's "ability to understand, remember, and carry out instructions was slightly impaired and he was not able to interact appropriately with supervisors, coworkers, or the public due to social anxiety, panic attacks, and trauma symptoms[.]" (AR 026.) According to the ALJ, Dr. Draper's opinion

> is vague as to the degree of limitation and appears to be an overestimate of the
> claimant's limitations and perhaps based on the claimant's subjective reports, as it
> is inconsistent with the conservative mental health treatment, unremarkable
> objective evidence from examinations, including Dr. Draper's mental status
> examination, generally normal activities of daily living, and the claimant's
> testimony that he could do simple jobs.

(AR 026.) The ALJ's decision contains no further explanation of his consideration of Dr. Draper's findings. The Court finds that the "reasons" the ALJ gave for according limited weight to Dr. Draper's "opinion" are legally inadequate and that the ALJ's decision fails to evince application of the correct legal standards for weighing Dr. Draper's opinions.

Initially, the Court notes that Dr. Draper offered opinions regarding Mr. Fliss's limitations in all four basic areas of functioning used to evaluate mental impairments: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ's decision mentions only two—Dr. Draper's opinions regarding Mr. Fliss's limitations in the areas of (1) understanding, remembering, and carrying out instructions, and (2) social interaction—and fails to evince consideration of the others. This, alone, is problematic because the ALJ must demonstrate that he at least considered all the opinions of record and further must provide explanations for rejecting opinions he did not accept. He failed to do so here.

Specifically, the ALJ's decision fails to either account for or explain why he was rejecting Dr. Draper's opinion that Mr. Fliss's "[s]ustained concentration and persistence are impaired." (AR 751.) Notably, the ability to "concentrate, persist, or maintain pace" is separate from both the ability to understand, remember, and apply information, and the ability to interact with others. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ's RFC included no limitation in this functional area, and his decision fails to provide any explanation for his implicit rejection of Dr. Draper's opinion. The ALJ's failure to account for or explain his rejection of this limitation is especially problematic given that (1) Dr. Draper provided a supporting explanation for his finding, and (2) Dr. Draper's opinion was consistent with both objective medical evidence and the other medical opinions of record, both of which served as bases for according Dr. Draper's opinion *more* weight. *See* 20 C.F.R. §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4) (providing that "more weight" is given to opinions that are well explained and/or consistent with the record as a whole).

Dr. Draper tied his finding regarding concentration and persistence to both objective medical evidence and other evidence, explaining that Mr. Fliss "was not able to complete serial

sevens and was not able to complete serial threes" and further that he "is not able to concentrate enough to read a book, does not work at hobbies, and does no activities on the computer." (AR 750, 751.) And Dr. Draper's opinion was generally consistent with the opinions of Dr. Simutis and Dr. Drake, the State agency consultants whose opinions the ALJ accorded "significant weight." Dr. Simutis and Dr. Drake both assessed Mr. Fliss as having a *moderate* limitation in the ability to maintain attention and concentration for extended periods.[6] (AR 251, 289.) Additionally, Dr. Simutis assessed *moderate* limitations in Mr. Fliss's ability to (1) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and (2) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.[7] (AR 252.) The ALJ's decision reflects no consideration of any of the foregoing, all of which tends to support Dr. Draper's opinion, which the ALJ—without explanation—rejected.[8]

Regarding the ALJ's explanation for discounting those of Dr. Draper's opinions he appears to have considered, the Court finds it ambiguous and difficult, indeed impossible, to understand.

---

[6] The Court acknowledges that Dr. Drake opined in his narrative explanation that Mr. Fliss "retains the ability, on a sustained basis, to . . . maintain concentration and attention for extended periods" (AR 290) and that the ALJ accorded that finding "significant weight[.]" (AR 026.) However, Dr. Drake provided no explanation and cited no evidence to support his conclusory finding, and he failed to reconcile his less restrictive assessment with Dr. Draper's more restrictive assessment. The Court fails to see—and the ALJ failed to explain—why the unexplained opinion of a non-examining State agency consultant should be adopted over the explained and supported opinion of an examining source. To the extent the ALJ rejected Dr. Draper's opinion regarding Mr. Fliss's ability to concentrate and persist based on Dr. Drake's statement in his narrative explanation, he failed to adequately justify that decision.

[7] The Court acknowledges that Dr. Drake disagreed with these opinions, finding Mr. Fliss "[n]ot significantly limited" in these areas of functioning. (*See* AR 289.) However, for the same reasons explained in n.6 *supra*, Dr. Drake's contrary, unexplained opinions do not necessarily and automatically provide a basis for the ALJ to ignore and effectively reject Dr. Draper's more restrictive concentration/persistence opinion.

[8] Dr. Draper's opinion was also consistent with other evidence of record, namely Mr. Fliss's mother's indication in her third-party function report that Mr. Fliss is able to pay attention for only thirty to forty-five minutes at a time, and Mr. Fliss's own report that he can only pay attention for "possibly 20-30 min[utes]." (AR 440, 449.) While not required to accept Mr. Fliss's or his mother's representations regarding his attention span, or Dr. Draper's opinion regarding Mr. Fliss's concentration/persistence limitation, the ALJ was required to at least demonstrate that he had considered the consistency of the evidence as a whole.

On the one hand, the ALJ's explanation might be understood as saying that he was according Dr. Draper's opinion "limited weight" because it is "inconsistent with the conservative mental health treatment, unremarkable objective evidence from examinations, including Dr. Draper's mental status examination, generally normal activities of daily living, and the claimant's testimony that he could do simple jobs." (AR 026.) Assuming this was the ALJ's intended meaning, there are at least two problems with his finding. The first is the fundamental problem of how the ALJ could determine that Dr. Draper's opinion was "inconsistent" with the record where he also found that Dr. Draper's opinion was "vague." If the ALJ was not even sure to what degree Dr. Draper believed Mr. Fliss was limited, he could not reasonably have concluded that Dr. Draper's opinion was "inconsistent" with evidence suggesting a lesser degree of impairment. The second, substantive problem is that the ALJ's explanation is generic and conclusory. The ALJ provided no explanation of how Dr. Draper's opinion was inconsistent with the "conservative mental health treatment, unremarkable objective evidence from examinations, including Dr. Draper's mental status examination, generally normal activities of daily living, and claimant's testimony that he could do simple jobs." He merely concluded that it was. And he cited not a single piece of evidence in support of that conclusion, leaving the Court unable to determine whether it is even arguably supported by substantial evidence.[9]

---

[9] The Commissioner attempts to save the ALJ's decision by citing evidence from the record—e.g., evidence regarding Mr. Fliss's daily activities (grocery shopping, walking his dogs, performing household chores)—that the Commissioner appears to argue supports the ALJ's discounting of Dr. Draper's opinions as inconsistent with the record. (Doc. 19 at 13-14.) However, that Mr. Fliss could walk his dogs, clean his mother's house, and go grocery shopping once a month for about forty-five minutes by his and his mother's account (see AR 437, 447) does not support finding Dr. Draper's social interaction opinion inconsistent with the record. Dr. Draper did not opine, for example, that Mr. Fliss was completely unable to leave his house due to his social anxiety and panic attacks. He merely opined that he is "not able to interact appropriately with supervisors, coworkers, or the public[.]" In addition to being impermissible, the Commissioner's post-hoc rationalizations are unavailing. See Haga v. Astrue, 482 F.3d 1205, 1207-08 (10th Cir. 2007) (explaining that reviewing courts "may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself").

The other possible way to read the ALJ's statement regarding the purported inconsistency of Dr. Draper's opinion is as justifying his conclusion that Dr. Draper's "vague" opinion was an "overestimate" of Mr. Fliss's limitations. That is to say, the ALJ could be reasoning that because Dr. Draper's opinion was "inconsistent" with other evidence, it necessarily overestimated Mr. Fliss's functional limitations and must have been based only on Mr. Fliss's subjective reports. But such unsupported reasoning would evince failure by the ALJ to comply with the SSA's well-defined procedures for evaluating medical opinions. Indeed, the ALJ's decision fails to demonstrate that he considered the explanations Dr. Draper provided to support his findings, explanations that cite both objective medical findings and other evidence and belie the ALJ's baseless speculation that Dr. Draper's opinions were "perhaps based on the claimant's subjective reports." It further fails to demonstrate consideration of the consistency of Dr. Draper's opinions with the record as a whole or the fact that Dr. Draper is a specialist who examined Mr. Fliss. In other words, the ALJ's decision fails to demonstrate that he applied the correct legal standards in weighing Dr. Draper's opinions.

In sum, the ALJ's handling of the examining source medical opinions is inadequate for numerous reasons. First, the ALJ's decision fails to evince that he weighed the opinions in accordance with the regulatory factors applicable to each opinion. Second, it fails to evince application of the correct legal standards for weighing Dr. Loescher's and Dr. Draper's examining source opinions vis-à-vis the opinions of the non-examining State agency consultants. Third, the explanations he gave for discounting Dr. Loescher's and Dr. Draper's opinions are plainly inadequate as they are conclusory, unsupported by substantial evidence, and/or simply incomprehensible. Remand is required so that the disability determination in this case rests on a proper consideration of these opinions.

##### 2.      The ALJ's Error in Handling Dr. Simutis's Opinions

To forestall further error on remand, the Court briefly addresses Mr. Fliss's argument regarding the ALJ's failure to either incorporate or explain why he was rejecting certain of the *moderate* limitations Dr. Simutis assessed. In discussing Dr. Simutis's opinions, the ALJ stated that Dr. Simutis opined that Mr. Fliss "could tolerate unskilled work where [his] interpersonal contact was incidental to the work performed; complexity of tasks was learned and performed by rote; there were few variables and little judgment; and supervision require[d] was simple, direct, and concrete[.]" (AR 026.) This summary corresponds to and accounts for those of Dr. Simutis's findings contained in her narrative explanation but does not address whether that explanation accounted for or explained the omission of any of Dr. Simutis's preliminary function-by-function findings. Mr. Fliss argues that because Dr. Simutis's narrative explanation did not fully account for her preliminary findings, specifically those relating to Mr. Fliss's sustained concentration and persistence limitations, the ALJ erred by relying exclusively on Dr. Simutis's narrative explanation and failing to either account for her unaccounted for preliminary findings in the RFC he assessed or explain why he was disregarding them. The Court agrees.

As noted in section III.B.1.b *supra*, Dr. Simutis's findings included that Mr. Fliss had moderate limitations in the ability to (1) maintain attention and concentration for extended periods, (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (AR 251-52.) Dr. Simutis's narrative explanation—which addresses Mr. Fliss's social interaction, understanding, and memory limitations—includes no statement addressing the sustained-concentration-and-persistence category of functioning and

therefore fails to account for the specific limitations she assessed in that area. Importantly and as also discussed previously, Dr. Simutis's findings are generally consistent with Dr. Draper's finding that Mr. Fliss's sustained concentration and persistence "are impaired," a finding for which the ALJ also did not account. The ALJ erred in failing to account for Dr. Simutis's findings of *moderate* limitations or explain why he was rejecting those findings.

On remand, the ALJ must take care to consider *all* the medical opinions of record and demonstrate application of the correct legal standards for weighing them. Specifically, he must demonstrate application of the relevant regulatory factors in deciding what weight to accord each opinion and give good, specific, nonconclusory reasons—supported by the evidence—for both the weight he accords opinions and any opinions he rejects. To the extent he continues to accord greater weight to the opinions of the non-examining State agency consultants than to those of Dr. Loescher and Dr. Draper, the ALJ must evince compliance with the applicable regulations and rulings and provide clear explanations to support his decision to do so. His failure to do any— much less all—of the foregoing in rendering his original disability determination necessitates remand for further proceedings

### C.     Mr. Fliss's Other Argument

Because remand is required as set forth above, the Court does not address the merits of Mr. Fliss's argument regarding the ALJ's step-five errors. *See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) (explaining that the reviewing court need not reach issues raised that "may be affected by the ALJ's treatment of th[e] case on remand").

### IV.     Conclusion

For the reasons stated above, Mr. Fliss's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 16) is GRANTED.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
United States Magistrate Judge
Presiding by Consent